IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


RICKY LYNN EDWARDS          )
          )
v.          )     NO. 3:07-1271
          )
MICHAEL J. ASTRUE,          )
Commissioner of Social Security          )


To: The Honorable John T. Nixon, Senior District Judge


**REPORT AND RECOMMENDATION**


The *pro se* plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff could perform a significant range of light work and, therefore, substantial gainful activity during the relevant time period is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the record (Docket Entry No. 20) should be denied.


I. INTRODUCTION

The plaintiff filed an application for DIB on June 5, 2003, alleging a disability onset date of April 18, 1997, due to a left upper extremity injury caused by a motor vehicle accident and a "worn

1

out" right arm.[1] (Tr. 52, 74-75.)  His application was denied initially and upon reconsideration. (Tr. 35-43.)  A hearing was held before Administrative Law Judge ("ALJ") D. Lydell Pickett on June 3, 2005. (Tr. 159-89.) The ALJ delivered an unfavorable decision on December 2, 2005 (Tr. 13-24), and the plaintiff petitioned for review of that decision before the Appeals Council. (Tr. 9.)  On June 13, 2006, the Appeals Council denied the plaintiff's request for review (Tr. 6-8), and the ALJ's decision became the final decision of the Commissioner.  The plaintiff was found not disabled through December 31, 2003, his date last insured. (Tr. 23, 81.)

## II.  BACKGROUND

The plaintiff was born on February 25, 1962, and was 35 years old as of April 18, 1997, his alleged onset date. (Tr. 52.)  The plaintiff completed high school (Tr. 166) and his past job was as a welder. (Tr. 74.)

### A. Chronological Background: Procedural Developments and Medical Records

In March of 1995, the plaintiff sustained several injuries from a motor vehicle accident that severely injured his left arm and lacerated his spleen. (Tr. 104-14.)  Due to those injuries, the plaintiff underwent a splenectomy and numerous surgeries on his left arm, including debridement,

_____

[1] Although the plaintiff contends that his onset date was March 9, 1995, see Docket Entry No. 20, at 18, in his signed Disability Report he indicated that he became unable to work on April 18, 1997, although he also indicated that he stopped working on March 9, 1995. (Tr. 75.)

2

open reduction and internal fixation of a comminuted[2] and dislocated left elbow fracture, repair of his extensor flexor muscle, fasciotomies[3] on his left forearm and hand, and nerve exploration. *Id.*

On May 15, 1996, the plaintiff presented to Dr. Ken Yamaguchi and complained that although his left elbow was "nontender," he could not "bend it sufficiently." (Tr. 118.) Dr. Yamaguchi noted that the plaintiff had good grip strength in his hand, "but he has complete loss of any radial function." (Tr. 119.) He concluded that the plaintiff should refrain from having any procedures done to his elbow until more functioning returned to his hand. (Tr. 117, 119.) Dr. Yamaguchi recommended that the plaintiff follow-up with him on "yearly to half yearly intervals." (Tr. 120.) The plaintiff returned to Dr. Yamaguchi on April 11, 2002, for a follow-up examination. (Tr. 116.) Dr. Yamaguchi noted that the plaintiff had no tenderness and reasonable stability in his left elbow. *Id.* He diagnosed the plaintiff with "[p]ost-traumatic arthrosis of the elbow which is painless" and concluded that "no treatment should be undertaken, considering that he has absolutely no pain in the elbow." *Id.*

The plaintiff filed two prior applications for DIB, both of which were denied. The plaintiff's second application was denied initially and on reconsideration on February 3, 2003, and the plaintiff did not seek further review. Therefore, the ALJ addressed the plaintiff's disability since February 3, 2003. (Tr. 17.)

On August 1, 2003, Dr. Bruce Davis examined the plaintiff and noted that he had an "obvious left upper extremity deformity" and decreased elbow flexion and extension, minimal and

---

[2] A comminuted fracture denotes bones "broken or crushed into small pieces." Dorland's Illustrated Medical Dictionary 395 (30th ed. 2003) ("Dorland's").

[3] A fasciotomy is a "surgical incision or transection of fascia, often performed to release pressure in compartment syndrome." Dorland's at 679.

ineffective finger wiggling, and no ability to clench a fist or pinch. (Tr. 121.) Dr. Davis opined that the plaintiff had right arm pain, but retained "full motion" in his shoulder, elbow, wrist, and hand. *Id.* He determined that the plaintiff exhibited a grip strength of "4/5." *Id.* Dr. Davis also completed a Medical Assessment of Ability to Do Work-Related Activities ("Medical Assessment") and determined that the plaintiff could occasionally and frequently lift/carry 10 pounds, but he could not assess the plaintiff's ability to stand, work, or sit. (Tr. 122-23.) Dr. Davis noted that the plaintiff was limited in his finger dexterity and grip. (Tr. 123.)

Dr. James Millis, a non-examining consultative physician, completed a physical residual functional capacity ("RFC") assessment on August 12, 2003 (Tr. 124-29), and opined that the plaintiff could lift/carry 10 pounds frequently and 20 pounds occasionally, stand/walk and sit about six hours in an eight hour day, and that pushing and pulling was limited in his upper extremities. (Tr. 125.) Dr. Millis noted that the plaintiff should never climb a ladder, rope, or scaffolding, and that his ability to reach, handle, finger, and feel in his left upper extremity was limited. (Tr. 126.) He opined that the plaintiff only had left hand manipulative limitations because the plaintiff's allegations of right arm pain were not credible since he had a 4/5 grip strength; retained a range of motion in his shoulder, elbow, wrist, and hand; and did not take pain medication. *Id.* Dr. Millis also determined that the plaintiff had no visual, communicative, or environmental limitations. (Tr. 126-27.)

Dr. Davis examined the plaintiff again on August 2, 2004, and found that his left arm had decreased sensation, shoulder abduction, and elbow flexion and extension; "ineffective finger clench, grip, [and] pinch;" finger swelling; and decreased biceps mass. (Tr. 135.) Dr. Davis opined that the plaintiff's right arm had normal shoulder, elbow, wrist, and finger motion, and a "good grip

4

(4/5)." *Id.* Although the plaintiff complained of overuse, soreness, and cramping in his right extremities, Dr. Davis noted that the plaintiff was not receiving treatment for those complaints. *Id.*

On March 24, 2005, Dr. Davis completed a physical Medical Source Statement of Ability to Do Work-Related Activities ("Medical Source Statement") and determined that the plaintiff could occasionally and frequently lift/carry 10 pounds, but he did not evaluate the plaintiff's ability to stand, work, or sit. (Tr. 131-32.) He opined that the plaintiff's pushing and pulling were limited in his upper extremities and that he should never crawl. (Tr. 132.) Dr. Davis noted that the plaintiff's ability to reach, handle, finger, and feel was occasionally limited. (Tr. 133.) He concluded that the plaintiff had no visual, communicative, or environmental limitations. *Id.*

Dr. Deborah Doineau, Ed.D., a psychologist, conducted a psychological evaluation of the plaintiff on June 21, 2005. (Tr. 138-43.) The plaintiff reported that before this evaluation, he had never received "any formal counseling or psychiatric treatment from a mental health professional." (Tr. 139.) He related that he cooks occasionally, is able to do some housework and laundry, runs errands, shops for groceries, makes his own decisions, takes care of his personal needs, and socializes occasionally. (Tr. 142.) Dr. Doineau diagnosed the plaintiff with depressive disorder, not otherwise specified, and a personality disorder, not otherwise specified, with avoidant and paranoid traits. (Tr. 142-43.) She also assigned the plaintiff a Global Assessment of Functioning ("GAF") score of 55 to 60.[4]

---

[4] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF score of 55 to 60 falls within the range of "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning." *Id.*

On July 8, 2005, Dr. Keith Nichols, conducted a series of electrodiagnostic tests on the plaintiff and concluded that his right wrist had moderate to severe neuropathy, but that there was "[n]o evidence . . . of a concomitant right ulnar or radial neuropathy,[5] plexopathy, or C5-T1 radiopathy." (Tr. 146-47.)

On August 1, 2005, Dr. Doineau completed a Medical Source Statement on the plaintiff and opined that his ability to maintain attention and concentration for extended periods, to work with others without being distracted by them, to complete a normal workday and workweek without being interrupted by psychologically based symptoms or an unreasonable number of rest periods, to ask simple questions or request assistance, to follow instructions and respond in an appropriate manner to criticism, and to get along with co-workers and peers was moderately limited. (Tr. 154-55.) She also determined that the plaintiff's ability to interact with the public, behave appropriately in social settings, and comply with basic standards of neatness and cleanliness was mildly limited. *Id.*

## B. Hearing Testimony: The Plaintiff and a Vocational Expert

At the hearing before the ALJ, the plaintiff was represented by counsel, and the plaintiff and Rebecca Williams, a Vocational Expert ("VE"), testified. (Tr. 160-89.) The plaintiff testified that his left arm was crushed in a car accident, which resulted in nerve damage and a lack of mobility. (Tr. 167.) He related that he does not feel pain in his left arm, but that he does feel pain in "his right hand side" because his right side has to overcompensate for his left arm. (Tr. 168.) The plaintiff explained that although he had not "been to the doctor" for his right side ailments, he was sure that

---

[5] Neuropathy is a "functional disturbance or pathological change in the peripheral nervous system, sometimes limited to noninflammatory lesions as opposed to those of neuritis; the etiology may be known or unknown." Dorland's at 1257.

Case 3:07-cv-01271   Document 30   Filed 10/19/09   Page 6 of 27 PageID #: 171

he had carpal tunnel in his right hand and arthritis in his right elbow and shoulder. (Tr. 168-69.) He stated that he could lift a gallon of milk with his right arm. (Tr. 170.)

The plaintiff testified that he has a problem with anger and that the injury to his left arm has caused him to feel depressed. (Tr. 172.) He related that he is no longer able to perform his past work. (Tr. 173.) The plaintiff testified that he lives alone, is able to make his own food, and "piddle[s] around" his house. (Tr. 175.) He related that he has not sought mental health treatment for his anger or depression, and that he has trouble sleeping due to neck and right shoulder pain. (Tr. 177.) The plaintiff also testified that Percocet and sleeping pills are the only medication that he has taken for his left arm injury. (Tr. 179.) He stated that before the car accident he was left hand dominant, but has since learned how to write with his right hand. (Tr. 181.)

The ALJ asked the VE to consider the limitations in Dr. Millis's physical RFC and if the plaintiff would be able to perform his past relevant work. (Tr. 183.) The VE responded that the plaintiff would not be able to perform his past relevant work, but that he would be able to work as a security guard, parking lot attendant, information clerk, or teacher's aide. (Tr. 183-84.) The ALJ then asked the VE to review Dr. Davis's Medical Source Statement and determine how those findings would affect the plaintiff's ability to do work. (Tr. 185.) The VE testified that the plaintiff would be able to perform the same jobs that she previously listed based on Dr. Millis's physical RFC. *Id.* The ALJ asked the VE to consider how the plaintiff's right arm limitations, specifically that "he would only be able to handle, finger, and reach on a frequent [and] not a constant basis," would affect his employment. *Id.* The VE indicated that the plaintiff would be able to perform all of the jobs that she previously listed since those positions were not "hand intensive jobs." (Tr. 186.) If the plaintiff could only "occasionally" use his right arm to handle, finger, and reach, the VE

7

testified that he could still work as a security guard, parking lot attendant, and information clerk, but would be precluded from working as a teacher's aide. *Id.*

The VE testified that if the plaintiff were not able to work "the full eight hours a day, five days a week" then he would be precluded from working any job. *Id.* She also stated that her testimony regarding the security guard could conflict with how that job is classified by the Dictionary of Occupational Titles, but that it was her "experience" that it was uncommon for a security guard to frequently use their upper extremities. (Tr. 187.)

### III. THE ALJ'S FINDING

1.   The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through December 31, 2003.

2.   The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.   The claimant's status post multiple crush injuries to the left upper extremity and nerve damage to the left upper extremity are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4.   These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.   The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.   The claimant has the following residual functional capacity: he is able to lift no more than ten pounds with limited ability to push/pull in the upper extremities, no crawling, with the ability to perform manipulative functions limited to occasionally, sit about 6 hours in

8

an 8 hour workday, and stand/walk about 6 hours in an eight hour workday.

7.     The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

8.     The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 404.1563).

9.     The claimant has a "high school (or high school equivalent) education" (20 CFR § 404.1564).

10.     The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 404.1568).

11.     The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 404.1567).

12.     Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as a security guard, a parking lot attendant, an information clerk, and a teacher's aide.

13.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)).

(Tr. 23).


# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C.A. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420,

28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C.A. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical

10

condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

11

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the plaintiff can perform, he is not disabled.[6] *Id. See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

---

[6] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if he applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

12

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

## B.  The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's case at step five of the five step process. (Tr. 23.) At step one, the ALJ found that the plaintiff successfully demonstrated that he had not engaged in substantial gainful activity since April 18, 1997, the alleged onset date of disability. *Id.*  At step two, the ALJ found that the plaintiff's left upper extremity was severely impaired after suffering "multiple crush injuries." *Id.*  At step three, the ALJ determined that the plaintiff's impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation 404. *Id.*  At step four, the ALJ found that the plaintiff was limited to work performed at a light exertional level and could not perform his past relevant work. *Id.*  At step five, the ALJ found that the plaintiff had the residual functional capacity to perform a full range of light work. *Id.*

The effect of this decision was to preclude the plaintiff from receiving DIB benefits and to find him not disabled, as defined in the Social Security Act, at any time after April 18, 1997, through December 31, 2003, his date last insured.

13

**C. The plaintiff's Assertions of Error**

The plaintiff contends, generally, that each of the ALJ's findings is "unsupported" and "insufficient." Docket Entry No. 20, at 19. The plaintiff argues that the ALJ erred in assessing the severity of his impairments; in determining that his impairment did not meet or equal a Listed Impairment; in assessing the medical evidence of consultating physician, Dr. Davis, and DDS physician, Dr. Millis; in analyzing his symptoms and subjective complaints of pain; and in concluding that his RFC enabled him to perform a full range of light work. Docket Entry No. 20, at 8-20. The plaintiff also contends that the Appeals Council erred in declining to accept his appeal for review. Docket Entry No. 20, at 9. Lastly, the plaintiff submitted additional medical evidence for this Court to review that was not a part of the record.

**1. The ALJ properly assessed the severity of the plaintiff's impairments**.

The plaintiff argues that although the ALJ correctly determined that his left upper extremity was severely impaired, the ALJ should also have found his right upper extremity to be severely impaired. Docket Entry No. 20, at 18. The plaintiff testified that he has right upper extremity pain from having to overcompensate for his severely impaired left arm. (Tr. 168.) However, the ALJ did not find the plaintiff's complaints of upper right extremity pain to be credible since "he has not received treatment for his right arm," was not taking medication for right arm pain at the time of his hearing, and was able to engage in numerous daily activities. (Tr. 20.)

According to 20 C.F.R. § 404.1520(c), which codifies step two of the five step sequential process, an impairment is considered severe if that impairment "limits your physical or mental ability to do basic work activities." *See also* 20 C.F.R. § 404.1521 ("An impairment or combination

14

of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.") The regulations define basic work activities as being the "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(a). The Sixth Circuit has construed the step two severity determination as a "de minimis" hurdle in the five step sequential process, but it still effectively screens out "claims that are 'totally groundless' solely from a medical standpoint." *Higgs*, 880 F.2d at 862-63 (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89-90 (6th Cir. 1985) and citing *Murphy v. Sec'y of Health & Human Servs.*, 801 F.2d 182, 185 (6th Cir. 1986)).

The severity of the plaintiff's left upper extremity impairment is well documented, but the opposite holds true regarding the severity of his right upper extremity impairment. The plaintiff testified that he never sought medical treatment for his right arm and related that he could pick up a gallon of milk with his right arm. (Tr. 169-70.) The plaintiff was examined by Dr. Davis on two occasions, and both times Dr. Davis opined that he had "full" or "normal" motion in his right shoulder, elbow, wrist, hand, and fingers. (Tr. 121, 135.) Dr. Davis also noted that the plaintiff had right hand grip strength of 4/5 and was not receiving treatment for his right upper extremity complaints. *Id.* Even though Dr. Nichols conducted a series of electrodiagnostic tests on the plaintiff and found that his right wrist had moderate to severe neuropathy, he also concluded that there was "[n]o evidence . . . of a concomitant right ulnar or radial neuropathy, plexopathy, or C5-T1 radiopathy."[7] (Tr. 146-47.) Furthermore, the plaintiff reported to Dr. Doineau that he cooks

---

[7] The ALJ, in his written decision, incorrectly stated that the plaintiff had left upper extremity nerve conduction studies, instead of right upper extremity nerve conduction studies. (Tr. 19.) However, it is clear that the ALJ intended to refer to the plaintiff's right upper extremity since in the remainder of the sentence he refers to "right median neuropathy at the wrist" and "right ulnar neuropathy or plexopathy." *Id.*

Case 3:07-cv-01271   Document 30   Filed 10/19/09   Page 15 of 27 PageID #: 180

occasionally, does some housework and laundry, runs errands, and shops for groceries. (Tr. 142.) The objective medical evidence and record evidence simply do not support the plaintiff's complaints that his right arm pain significantly limits his physical abilities. Thus the ALJ properly concluded that the plaintiff's right arm condition was not a severe impairment.

### 2. The ALJ correctly determined that the plaintiff did not meet or equal a Listed Impairment.

The plaintiff contends that his left upper extremity impairment meets or equals a listed impairment, but he failed to specify the exact listing that he equals or meets. Docket Entry No. 20, at 18. "'[T]he burden of proof lies with the [plaintiff] at steps one through four of the [sequential disability benefits analysis],' including proving presumptive disability by meeting or exceeding a Medical Listing at step three." *Little v. Astrue*, 2008 WL 3849937, at *4 (E.D.Ky. Aug. 15, 2008) (quoting *Her*, 203 F.3d at 391). Thus, the plaintiff "'bears the burden of proof at Step Three to demonstrate that he has or equals an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1.'" *Little*, 2008 WL 3849937, at *4 (quoting *Arnold v. Comm'r of Soc. Sec.*, 238 F.3d 419 (table), 2000 WL 1909386, at *2 (6th Cir. Dec. 27, 2000)). The plaintiff's impairment must meet all of the listing's specified medical criteria and "[a]n impairment that meets only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-532, 110 S.Ct. 885, 107 L.Ed.2d 967(1990). If the plaintiff does demonstrate that his impairment meets or equals a listed impairment, then the ALJ "'must find the [plaintiff] disabled.'" *Little*, 2008 WL 3849937, at *4 (quoting *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir.1987)).

The Commissioner asserts that although the plaintiff did not specify which listed impairment he meets or equals, his left upper extremity impairment is best analyzed under Listing 1.05, as

16

potentially equaling a disabling "Amputation." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.05. However, the Court disagrees with the Commissioner's assessment since Listing 1.05 requires either both hands to be amputated, a hemipelvectomy or hip dislocation, amputation of one hand and one lower extremity, or an impairment affecting one's lower extremities. *Id.* The plaintiff's left upper extremity impairment does not meet the requirements of Listing 1.05 since his hands are not amputated, he does not suffer from a hip impairment, and his lower extremities are not impaired.

The Court finds that the plaintiff's impairment is more appropriately analyzed under Listing 1.07, which states that a person will be found disabled if he has a

> [f]racture of an upper extremity with nonunion of a fracture of the shaft of the humerus, radius, or ulna, under continuing surgical management, as defined in [section] 1.00M, directed toward restoration of functional use of the extremity, and such function was not restored or expected to be restored within 12 months of onset.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.07. The plaintiff satisfies the first part of Listing 1.07 since his left upper extremity was severely injured in an automobile accident. (Tr. 104-14.) The second prong of Listing 1.07 requires evidence of "continuing surgical management," which the regulations define as

> surgical procedures and any other associated treatments related to the efforts directed toward the salvage or restoration of functional use of the affected part. It may include such factors as post-surgical procedures, surgical complications, infections, or other medical complications, related illnesses, or related treatments that delay the individual's attainment of maximum benefit from therapy.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00M. The record indicates that the plaintiff underwent a series of surgeries on his left arm immediately following his automobile accident (Tr. 104-14), but there is no evidence of the plaintiff undergoing any additional surgical procedures. Further, Dr. Yamaguchi examined the plaintiff on May 15, 1996, nearly a year after his left upper extremity surgeries, and concluded that he should refrain from having any additional procedures done to his

17

left elbow so his left hand could continue to regain its functional ability. (Tr. 117, 119.) Dr. Yamaguchi examined the plaintiff six years later, on April 11, 2002, and noted that the plaintiff had no tenderness and had reasonable stability in his left elbow. (Tr. 116.)  He concluded that the plaintiff did not need to receive any additional treatment since he did not have pain in his left elbow. *Id.*

Since Dr. Yamaguchi advised against the plaintiff having additional surgery on his left arm and there is no record evidence indicating that the plaintiff received "continuing surgical management," the plaintiff fails to meet the second part of Listing 1.07. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.07.  Thus, the ALJ properly concluded that the plaintiff's severe upper left extremity impairment did not meet or equal a listed impairment. (Tr. 20.)

### 3.  The ALJ properly assessed the medical evidence of Dr. Davis and Dr. Millis.

The plaintiff contends that the ALJ erred in assessing the opinions of Dr. Davis and Dr. Millis, since the ALJ assigned "great weight" to Dr. Davis's medical findings. Docket Entry No. 20, at 16.  The ALJ concluded that

> [o]pinion evidence of record includes that of Dr. Davis, set forth above, that the claimant is able to lift 10 pounds frequently and occasionally, is limited in his ability to push/pull, is unable to crawl, is limited to occasionally in his ability to reach, handle, finger, and feel. Since Dr. Davis examined the claimant during the relevant time period herein and because his conclusions are consistent with his findings on examination, the undersigned assigns great weight to his opinions.  The DDS opined that the claimant could lift up to 20 pounds occasionally, but in giving the claimant the benefit of the doubt and in giving more weight to an examining source, the undersigned finds that a lifting limit of 10 pounds is more appropriate.  Dr. Davis did not articulate an opinion regarding the [plaintiff's] ability to sit, stand, or walk.  Since the [plaintiff] has no impairment affecting his lower extremities, the undersigned concludes as did the DDS examiners, that the claimant is able to sit about 6 hours in an 8 hour workday, and stand/walk about 6 hours in an eight hour workday.

18

(Tr. 21.) According to the regulations, the ALJ must consider the examining relationship between the plaintiff and the physician when weighing medical opinions: "Generally, we give more weight to the opinion of a source who has examined [the plaintiff] than to the opinion of a source who has not examined [the plaintiff]." 20 C.F.R. § 404.1527(d)(1). Dr. Davis examined the plaintiff on two occasions before completing his Medical Assessment and Medical Source Statement on the plaintiff (Tr. 121-23, 135), but DDS physician Dr. Millis did not examine the plaintiff before completing his physical RFC on the plaintiff. (Tr. 124-29.) By assigning "great weight" to the findings of Dr. Davis, an examining physician (Tr. 21), the ALJ clearly complied with 20 C.F.R. § 404.1527(d)(1).

The Court also notes that Dr. Davis's medical findings restricted the plaintiff's ability to lift/carry to a greater degree than did Dr. Millis's medical findings. (Tr. 121-29, 135) Dr. Davis opined that the plaintiff could occasionally and frequently lift/carry 10 pounds, while Dr. Millis noted that the plaintiff could lift/carry 10 pounds frequently and 20 pounds occasionally. *Id.* By assigning greater weight to the more restrictive limitation imposed by Dr. Davis the ALJ made a determination that was actually more favorable to the plaintiff. (Tr. 21.)

The ALJ did not err in assigning "great weight" to Dr. Davis's medical opinions since he complied with 20 C.F.R. § 404.1527(d)(1) and properly afforded more weight to the medical findings of the examining physician. The ALJ also provided clear and specific reasoning for this determination in his decision. (Tr. 21.)

19

**4. The ALJ did not err in analyzing the plaintiff's symptoms or subjective complaints of pain.**

The plaintiff alleges, generally, that the ALJ erred in evaluating the credibility of his symptoms and subjective complaints of pain. Docket Entry No. 20, at 15-19. The ALJ found that

> [w]hile the [plaintiff] clearly has permanent injuries that would prevent him from returning to his past work as a welder, it does not follow that his condition prevents all work and his testimony in that regard is less than credible. Indeed, the record herein suggests that the [plaintiff] is able to engage in many activities including owning and managing a business.[8] In addition, in describing daily activities to Dr. Doineau, the [plaintiff] stated that he is able to cook, clean his apartment, do laundry, run errands, do his grocery shopping, pay his bills, make his own decisions, and keep up with personal needs. He reported that he occasionally will go out to have a beer with an acquaintance. In 2002, the last time he was examined by a treating source, his specialist recommended no treatment for the left arm because he had absolutely no pain. During the period at issue herein, the [plaintiff] took no pain medication. Dr. Davis briefly examined the [plaintiff] in 2003 in order to determine whether he still qualified for private benefits.[9] Dr. Davis noted that the [plaintiff] was not receiving any treatment for left or right arm pain. At that time, the [plaintiff] stated his right arm hurt due to "overuse". For all of these reasons, the undersigned finds that the [plaintiff] is less than fully credible.

(Tr. 20-21.) The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision on credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the [plaintiff] and judge [his] subjective complaints." *See Buxton v. Halter*, 246 F. 3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F. 3d at 1036).

---

[8] The ALJ found that the plaintiff had engaged in substantial gainful activity through at least February 3, 2003, based on his involvement with a check cashing business and a pawn shop. (Tr. 18.)

[9] It is not clear what "private benefits" the plaintiff was receiving.

20

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186 at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at 5. The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. *Id.*

Both the Social Security Administration ("SSA") and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. § 404.1529; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[10] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039. The second prong has two parts: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition, or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)). The SSA also provides a checklist of factors to assess symptoms,

_____

[10] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n. 2.

21

including pain, in 20 C.F.R. § 404.1529(c).[11]  The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of his pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2).

There is objective medical evidence of the plaintiff's underlying right arm medical condition. (Tr. 146-47.)  Dr. Nichols diagnosed the plaintiff with moderate to severe right wrist neuropathy. *Id.*  This objective medical evidence satisfies the first prong of the *Duncan* test.  However, there is minimal objective medical evidence confirming the pain that the plaintiff attributed to this condition and no objective evidence indicating any additional right upper extremity impairments.  The Sixth Circuit has noted that "[w]ithout such evidence, this Court will generally defer to the ALJ's assessment." *Hash v. Comm'r of Soc. Sec.*, 309 Fed. Appx. 981, 990 (6th Cir. Feb. 10, 2009) (citing *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir.1990) ("deferring to the ALJ's credibility analysis where there was no objective medical support to confirm the disabling effects of claimant's underlying medical condition")).

The ALJ also determined that the plaintiff's level of activity was inconsistent with his alleged left and right arm pain. (Tr. 20-21.)  The plaintiff related to Dr. Doineau that he cooks occasionally, does housework and laundry, runs errands, shops for groceries, makes his own decisions and takes care of his personal needs, and socializes occasionally. (Tr. 142, 175.)  He

---

[11] The seven factors under 20 C.F.R. § 404.1529(c)(3) include: (i) the plaintiff's daily activities, (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff  takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms, (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on his back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.), and (vii) other factors concerning plaintiff's functional limitations and restrictions due to pain or other symptoms.

22

testified that he does not feel pain in his left arm, has pain in his "right hand side" but is able to life a gallon of milk with his right arm, lives alone, is able to make his own food, and "piddle[s]" around his house. (Tr. 168, 175.) The ALJ also relied on the treatment notes of Dr. Yamaguchi, indicating that the plaintiff had no pain in his left elbow, and on Dr. Davis's medical findings, noting that the plaintiff's right arm had 4/5 grip strength, that the plaintiff retained a range of motion in his shoulder, elbow, wrist, and hand, and that the plaintiff did not take pain medication. (Tr. 126.) The plaintiff related to Dr. Davis that despite his complaints of right arm soreness and cramping due to overuse, he was not receiving any medical treatment. (Tr. 135.)

The ALJ properly weighed the evidence in the record and did not err in determining that the plaintiff's allegations of disability were not credible. In making his credibility determination, the ALJ relied upon the treatment notes of Dr. Yamaguchi, Dr. Doineau, and Dr. Davis, and the plaintiff's own reports of his activities of daily living. Thus, the ALJ properly complied with the *Duncan* test and 20 C.F.R. § 404.1529(c)(2)**.**

### 5. The ALJ properly evaluated the plaintiffs physical RFC in determining that he could perform light work.

The plaintiff objects to the ALJ's RFC assessment because it "requires physical exertion." Docket Entry No. 20, at 19. The ALJ determined that the plaintiff retained the RFC "to lift no more than ten pounds with limited ability to push/pull in the upper extremities, no crawling, with the ability to perform manipulative functions limited to occasionally, sit about 6 hours in an 8 hour workday, and stand/walk about 6 hours in an eight hour workday." (Tr. 21.) The ALJ concluded that the plaintiff's RFC enabled him to perform "a significant range of light work as defined in 20 CFR § 404.1567." (Tr. 22.)

23

An individual's RFC is "a medical assessment of what that individual can do in a work setting in spite of functional limitations and environmental restrictions imposed by all of his medically determinable impairments." *Woods v. Comm'r of Soc. Sec.*, 2009 WL 3153153, at 8 (W.D.Mich. Sept. 29, 2009) (citing 20 C.F.R. § 404.1545). In assessing an individual's RFC, the ALJ considers the individual's "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4). The plaintiff alleges disability due to a physical impairment, so the ALJ must consider his ability "to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching) [and how those functions] may reduce [his] ability to do past work and other work." 20 C.F.R. § 404.1545(b).

In evaluating the plaintiff's RFC, the ALJ relied heavily on Dr. Davis's medical findings. (Tr. 21.) Dr. Davis examined the plaintiff on two occasions and found that he could occasionally and frequently lift/carry 10 pounds; was limited in his ability to reach, handle, finger, and feel; was restricted in his upper extremities ability to push and pull; and had no visual, communicative, or environmental limitations. (Tr. 122-23, 131-32.) The ALJ also relied on the plaintiff's own description of his daily activities, including those that he related to Dr. Doineau. (Tr. 20-21, 142, 175.) Given the ALJ's detailed analysis of the plaintiff's RFC (Tr. 21-22), it is clear that he carefully considered all the record evidence and properly concluded that the ALJ retained the ability to perform substantial gainful activity and more specifically, "a significant range of light work." (Tr. 22.)

24

**6. A sentence six remand under 42 U.S.C. § 405(g) is inappropriate to consider the new evidence provided to the Court.**

The plaintiff attached medical records to his brief that were not presented to the Commissioner for consideration. Docket Entry No. 20-1 and 20-2. Newly submitted evidence that is not reviewed by the Commissioner can only be considered with a sentence six remand under 42 U.S.C. § 405(g). The new evidence consists of photographs and x-rays of the plaintiff's left arm, medical treatment records of the plaintiff's right arm, and medical treatment records relating to the plaintiff's neck sprain. Docket Entry No. 20-1 and 20-2.

The Court can require an ALJ to consider additional evidence on remand only if the plaintiff shows that the evidence is "new" and "material," and provides "good cause" for failing to include the evidence in the record prior to the ALJ's decision. 42 U.S.C. § 405(g). *See also Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). A majority of the additional medical reports submitted by the plaintiff were completed between April and May of 2006, nearly a year after his hearing. Docket Entry No. 20-2, at 1-16. Thus, the new evidence and good cause requirements are satisfied since the medical records had not been completed by the time the plaintiff's hearing took place. However, the plaintiff falls short in satisfying his burden of proof regarding the materiality of the medical records.

As noted in *Sizemore*, in order for the plaintiff to meet the burden of proving materiality, he "must demonstrate that there was a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." 865 F.2d at 711 (citing *Carroll v. Califano*, 619 F.2d 1157, 1162 (6th Cir. 1980)). The plaintiff failed to show how the additional medical records he submitted would lead the Commissioner to reach a different conclusion since he did not offer any explanation, argument, or rationale for the Court to consider.

Dr. Sean Kaminsky, a shoulder and sports medicine specialist, diagnosed the plaintiff with "[r]ight shoulder impingement syndrome" and "[r]ight tennis elbow," but he also noted that the plaintiff's pain was "mild." Docket Entry No. 20-2, at 6. Dr. Kaminsky suggested that the plaintiff have further x-rays of his shoulder and elbow, but the plaintiff declined and related that he would "simply tolerate the pain and symptoms." *Id.* While the submitted medical reports do discuss the plaintiff's various right upper extremity impairments, there is no indication that these reports are dissimilar from the medical reports previously considered by the ALJ or inconsistent with the ALJ's RFC determination.

### 7. The Appeals Council properly declined to review the ALJ's decision

The plaintiff contends that the Appeals Council erroneously declined his request for review of the ALJ's decision. Docket Entry No. 20, at 9. If an individual is

> dissatisfied with the hearing decision or with the dismissal of a hearing request, [that individual] may request that the Appeals Council review that action. The Appeals Council may deny or dismiss the request for review, or it may grant the request and either issue a decision or remand the case to an administrative law judge.

20 C.F.R. § 404.967. Once the Appeals Council denies review of the ALJ's decision, the ALJ's decision becomes the final determination of the Commissioner. 42 U.S.C. § 405(g). The individual may then obtain judicial review of that decision by filing a civil action in United States District Court. *Id.* It is a well-established principle of social security law that the Court's standard of review "is limited to determining whether there is 'substantial evidence' in the record to support the ALJ's decision and whether the ALJ applied the proper legal standards." *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). *See also* 42 U.S.C.A. § 405(g). As noted in *Nash v. Comm'r of Soc. Sec.*, "the scope of the court's review is defined by statute, and does not encompass the Appeals Council's

discretionary decision whether to grant review." 2009 WL 1531835, at 5 (W.D.Mich. June 1, 2009) (citing *Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir.2001) ("No statutory authority (the source of the district court's review) authorizes the court to review the Appeals Council decision to deny review.")). Although the Court cannot review the Appeals Council's decision to deny review of the ALJ's findings, the plaintiff receives essentially the same relief when the Court reviews the ALJ's decision.

## V.  RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 20) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made.  Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*. 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

JULIET GRIFFIN
United States Magistrate Judge

27